

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ANDRE SEAN MCDONALD, | § | No. 08-23-00132-CR |
| Appellant, | § | Appeal from the |
| v. | § | 399th Judicial District Court |
| THE STATE OF TEXAS, | § | of Bexar County, Texas |
| Appellee. | § | (TC# 2019CR10911) |

## <u>MEMORANDUM OPINION</u>

Appellant Andre McDonald was charged with the murder of his wife, Andreen McDonald; he was convicted of the lesser-included offense of manslaughter. He appeals raising ten issues. For the reasons stated below, we affirm.

## I. Factual and Procedural Background

### A. Background facts

Appellant and Andreen were married and had one daughter. They all lived together in San Antonio with Andreen's mother, Hyacinth "Maureen" Smith.[1] Appellant was a major in the Air

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent they might conflict with our own. *See* Tex. R. App. P. 41.3.

Force and the couple owned an assisted living center business. Their marriage had become contentious and Andreen had rekindled a relationship with an ex-boyfriend in Jamaica.

On February 28, 2019, Appellant and Andreen visited their tax preparer. While there, Appellant learned that Andreen had started a new business in her name. This started an argument that spanned the afternoon and into the night. The next morning Andreen's friend Carol Ghanbar received a call from one of Andreen's employees that Andreen had not shown up to her morning work-out or to work. Nor was she answering her phone or returning calls, all of which were out of character for Andreen.

Carol and Andreen had been friends for five years. Although they were competitors in the same industry, they often spoke daily, worked out together, and spent time together socially. Carol was immediately concerned that Andreen was missing because Andreen had told her about violence in their marriage. Carol knew about Andreen's relationship with her ex-boyfriend, that her and Appellant fought often, and that the arguments became physical. She agreed with the characterization of the fights as "mutual combat." Andreen had told Carol that if she ever went missing, it would be because Appellant had killed her and "to come and find her."

Carol picked up one of her employees and they went to Andreen's house. After knocking on the front door with no answer, they went to the back door. That door was unlocked and they went inside. Although Andreen's car and purse were there, no one was home, and it appeared to Carol that Andreen had not been home in some time; the dogs had no water or food and had defecated on the normally spotless floor. Carol walked through the house. In the master bathroom, she saw an apparent smudge of blood and hair on the light switch. In the back yard, she saw a small burn pile on the walkway in which she found a burned zipper. She left the house and drove to a nearby gas station and called Brian Ray, a friend who was also a homicide detective with the

San Antonio police department. She sought his advice on how quickly a missing person's report could be initiated. He advised her that Andreen's mother, Maureen, could immediately make a missing report and that she should bring Maureen back to the house and then call the police.

Around this time, Appellant returned Carol's phone calls and told her that Andreen was probably at home. When Carol told Appellant that she had been to his house, he said he was leaving work and would go check the house for Andreen himself.

Carol followed Ray's advice and brought Maureen back to the house. When Carol, the co-worker, and Maureen arrived at the McDonald residence, Appellant was there, but he quickly left, saying he would check the hospital. Deputy Filiberto Gonzalez from the Bexar County Sheriff's Office arrived at the house soon after and Maureen gave Gonzalez consent to search the house.

Meanwhile, Appellant went to a nearby hospital inquiring about his wife. He was told that she was there but without getting any more information, Appellant left the hospital and went back to his house. On his return, he told the officers that Andreen was at the hospital, but he did not see her or know her condition. As the deputies later learned, coincidentally, there was a person admitted to the hospital with the last name "McDonald," but she was not Andreen.

Appellant was detained while his house was searched. Along with the blood on the light switch and the burn pile in the back yard, officers also found blood on the door to the master bathroom and tests showed the presence of blood on and in Appellant's car. Late that night, the deputies finished their search and left the residence.

On the morning of March 2, 2019, Appellant went to the hardware store and bought two gas cans, a log splitter, an axe, a shovel, gloves, and contractor trash bags. After he returned home, Appellant's Air Force Commander and another officer visited him briefly. After they left,

3

Appellant called them for help finding a garage door repair company because he had backed his car into the garage door. Meanwhile, the Sheriff's Department began surveillance of Appellant.

Appellant left home again and went to a gun store. He paid for a gun and ammunition, but when he noticed that he was being watched, he left the gun store without his purchases. On leaving the gun store, Sheriff's Deputies briefly arrested him and at his base Commander's direction, he was taken to a hospital for a psychiatric evaluation, and then released. While he was away at the gun store, deputies not involved in the surveillance were asked to do a welfare check at Appellant's home.

When the deputies arrived at the home, they saw that the garage door was torn off the tracks so that it hung diagonally across the opening of the garage. Deputies Richard Lozano and Ryan Gabriel testified that because of the damaged door they were worried that someone could be hurt inside. They entered the garage and looked in the windows of the vehicle parked there. They saw the shovel that Appellant purchased that morning in the back of the vehicle. After entering the house through an open window and determining that no one was inside, the deputies left.

After the welfare check on March 2nd, and now armed with a search warrant, the Sheriff's deputies again searched Appellant's house. The investigators found clothing, a hammer, and a flashlight in a trash bag in the garage. Inside, they found the hardware store receipt and more clothing in a bag. In the vehicles, they found a roll of heavy plastic, gloves, and axes, most of which appeared to be new. Presumptive blood tests showed the presence of blood on the hammer and Appellant's clothing. On March 3, 2019, Appellant was arrested for tampering with evidence; he bonded out the next month.

In early July 2019, Andreen's charred remains were found in a field. The autopsy revealed that Andreen had a complete fracture of her jaw, fractures and damage done to some vertebrae and

4

heat related fractures. Some of these injuries appeared to be caused by a multi-faced tool. There was no evidence of healing, indicating that the injuries were received shortly before or after death. The medical examiner found that the cause of death was homicide based on blunt force trauma.

On July 13, 2019, Appellant was arrested for Andreen's murder. He remained in jail until the trial court reduced his bond in November 2021. Trial began on January 17, 2023, and lasted 13 days, including a three-day hearing on Appellant's motion to suppress. During the weekend between picking the jury and the beginning of trial, Appellant called Maureen and Sindian Johnson, Andreen's half-sister, and confessed that he killed Andreen. He said he did not want them to hear what happened to Andreen for the first time in court. Appellant told them that he and Andreen argued because she started a business in her sole name. The argument turned physical, and he pushed her to the floor and "stomped" on her. When their daughter came downstairs, Appellant left Andreen, who was lying on the floor wheezing. By the time he put his daughter to bed and went back to the bathroom, Andreen had died. Appellant told them that he took Andreen's clothes off and burned them. He put her body in his car. He planned to chop up her body but changed his mind.

Appellant testified at trial. His testimony tracked his confession to Maureen and Sindian but included more details. He testified that on the evening of February 28, to avoid more arguments, he left the house. When he returned around midnight, Andreen was still awake, and their argument resumed. Appellant said that Andreen cursed and spit in his face and, by reflex, he grabbed and hit her head with his. Her face began to bleed, and she went to the master bathroom to look in the mirror. He followed her into the bathroom. Appellant then claimed that Andreen charged at him, trying to punch him, and he grabbed and tripped her. Once she was on the ground, he kicked her twice and she began to wheeze. After he discovered that she had died, he put her

body in the trunk of his car and brought her to the field where she was found. He took her clothes off and brought them home to burn them. He sent her a few texts after she died so that it would appear he did not know where she was. The next morning, he broke and threw away her phone.

Appellant became angry when the deputies searched his house on March 1st. He believed that Andreen's recent attempts to get him to go to Jamaica were part of a plan to have her boyfriend kill him. After the deputies left his house, he drove back to the field where he had left Andreen's body. Appellant says that he was "angry as hell" and felt that the whole situation was Andreen's fault. He lit her body on fire and hit her face and neck area with a hammer. The next day, when he went to the hardware store, he purchased items to chop up Andreen's body, set it on fire, and bury her bones. He testified that he did not do so because he changed his mind; but later in the day is also when his purchases were seized.

### B. The jury's verdict and the punishment

The jury acquitted Appellant of murder but found him guilty of manslaughter. Based on his election to have the trial court assess punishment, the judge made a deadly weapon finding and sentenced Appellant to 20 years, the maximum sentence for manslaughter. In a separate case, Appellant was charged with tampering with evidence. He pleaded guilty to that charge and was sentenced to five years to run consecutively with his murder charge.

### C. Issues raised on appeal

Appellant raises seven issues for our review. Issue One includes four sub-issues addressing the denial of Appellant's motion to suppress. In Issue Two, Appellant argues that he was denied a speedy trial. In Issue Four, Appellant argues that he did not receive sufficient notice that the State would seek a deadly weapon finding. Issue Five complains that the evidence was legally

6

insufficient for the jury to reject Appellant's claim of self-defense. Finally, Issues Three, Six, and Seven all raised challenges to the jury charge that we detail below.

## II. ANALYSIS

### A. Motion to suppress

Appellant filed a multi-part motion to suppress that the trial court heard over a three-day hearing. The trial court issued a 21-page order detailing Appellant's arguments, the testimony and evidence presented, and its findings and conclusions of law on each of Appellant's claims. The order suppressed any evidence obtained because of Appellant's arrest outside the gun store, including the medical records of his psychiatric evaluation that followed. The court denied the rest of the motion.

Appellant challenges the trial court's denial of his motion to suppress in four sub-issues arguing that (1) the evidence found by Carol and her co-worker was illegally obtained; (2) the search on March 2nd by deputies while conducting a welfare check was not justified by the community caretaking or emergency exception; (3) Appellant should have been given a *Franks* hearing to challenge statements in the search warrant; and (4) there was no probable cause to search Appellant's phone.

#### (1) Standard of review

Appellate courts review a trial court's ruling on a motion to suppress under a bifurcated standard. *State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020). Under that standard, we must give "almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (en banc). This same level of deference is given to a trial court's ruling on "application of law to fact

questions," or "mixed questions of law and fact," if the resolution of those questions turns on an evaluation of credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007), quoting *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006). But we review de novo the trial court's determination of legal questions and the application of the law to facts that do not turn upon a determination of witness credibility and demeanor. *Arellano*, 600 S.W.3d at 57–58. "We view the record in the light most favorable to the trial court's ruling and uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case." *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019).

### (2) The initial search by private parties

The first search of the McDonald residence was done by private citizens–Carol Ghanbar and her coworker. They discovered blood and hair on the bathroom light switch and a burn pile in the backyard. Appellant argues that the court should have suppressed this evidence because the search violated the Fourth Amendment and § 38.23 of the Texas Code of Criminal Procedure. On these issues, the trial court heard the testimony of Carol Ghanbar, Maureen Smith, Deputy Filiberto Gonzalez, and Brian Ray, all of whom it found to be "truthful and credible."

### (a) Fourth Amendment

The Fourth Amendment only protects against the *government's* unreasonable searches and seizures. *Ruiz*, 577 S.W.3d at 546; U.S. Const. amend. IV. A private individual cannot violate the Fourth Amendment unless they are "acting under the control of, or at the behest, or law enforcement." *Cobb v. State*, 85 S.W.3d 258, 270–71 (Tex. Crim. App. 2002); *Ruiz*, 577 S.W.3d at 547 ("We reaffirm that the Fourth Amendment is a restraint on government and that it does not apply to private individuals who are acting as such."). To determine whether an individual is acting on behalf of law enforcement, we ask "(1) whether the government knew of, and acquiesced in,

the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or, instead, to further his own ends." *Dawson v. State*, 106 S.W.3d 388, 392 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

Appellant argues that Carol was "aided and directed by a SAPD Detective" because she spoke with Brian Ray, a friend who was a homicide detective with the San Antonio Police Department. He recommended that she bring Andreen's mother to the house and to call the Sheriff's Department.[2] At any rate, she did not speak to Detective Ray until *after* she had entered the house and discovered blood and the burn pile. There is no evidence that the detective or any law enforcement officer knew of, directed, or acquiesced in Carol's conduct before or during her search. And the fact that the officers, once learning about Carol and Elizabeth's discoveries, conducted their own search, does not retroactively convert her private search to a governmental one. The police can duplicate a private party's search of a residence so long as they have a warrant or meet an exception. *See, E.g., State v. Rodriguez*, 521 S.W.3d 1, 22 (Tex. Crim. App. 2017) (holding that the appellant retained an expectation of privacy even after a private citizen search and law enforcement had to meet to meet an exception to conduct a warrantless search of her room).

### (b)  Texas Code of Criminal Procedure §38.23

Although the Fourth Amendment does not apply to purely private searches, the Texas exclusionary rule provides broader restrictions. Evidence obtained by private individuals must be excluded under Texas state law if it is obtained in violation of the law. *Cobb*, 85 S.W.3d at 270–71; Tex. Code Crim. Proc. art. 38.23(a) ("No evidence obtained by an officer *or other person* in

---

[2] The case was investigated by the Sheriff's Department, not the San Antonio Police Department. The record does not indicate that Ray had any role the investigation before or after he spoke with Carol.

violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence . . . .") (emphasis added); *Miles v. State*, 241 S.W.3d 28, 36 (Tex. Crim. App. 2007) ("if an officer violates a person's privacy rights by his illegal conduct . . ., that same illegal conduct undertaken by an "other person" is also subject to the Texas exclusionary rule").

Appellant argues that Carol's search constituted criminal trespass and so the evidence should be excluded. A person commits trespass if they "enter[] or remain[] on or in property of another . . . without effective consent." Tex. Pen. Code Ann. §30.05(a). Carol admitted that she had never let herself into the house before without being invited to by Andreen. But the trial court did not find that Carol had blanket consent to enter the property whenever she wanted. Instead, the trial court found that, in the specific circumstance that Andreen was missing, Carol had implied consent to enter the home and to "come and find her." This finding is supported by Carol's testimony: "Many times [Andreen] told me that if anything ever happened to her, to come and find her, that, you know, she didn't take off, she didn't go anywhere, and she would always say that [Appellant] killed her." Because Carol had Andreen's consent to enter the home if she was missing, she did not obtain evidence in violation of Texas law and her search is not subject to the exclusionary rule.

The trial court also found that Carol's search was legal and valid for an alternate reason– because it was done under the emergency aid exception. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963); *see also Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). The emergency aid exception is not only an exception to the Fourth

10

Amendment's warrant requirements; it also applies to the actions of private individuals. "[A] private person can do what a police officer standing in his shoes can legitimately do, but cannot do what a police officer cannot do." *Miles*, 241 S.W.3d at 39. A police officer's, and thus a private citizen's, actions fall under the emergency aid exception if "the circumstances, viewed objectively, justify [the] action." *Scott v. United States*, 436 U.S. 128, 138 (1978).

Andreen had not shown up for her morning work-out or to her workplace and she was not answering or returning calls, which Carol knew was unusual. Carol was worried about her safety because of what Andreen had told her about the violence in her marriage. Once Carol and Elizabeth entered the house, the condition of the home did nothing to assuage their fears. Although her car and purse were still there, it appeared that Andreen had not been home for a while–the dogs had no food or water and there was dog feces on the floor. A police officer, knowing all the facts that Carol knew, would have been justified in believing that Andreen needed immediate assistance. *See Pitonyak v. State*, 253 S.W.3d 834, 852 (Tex. App.—Austin 2008, pet. ref'd) ("We conclude that a police officer standing in Sedwick's shoes would have had an objectively reasonable belief that an emergency situation existed and that entry into appellant's apartment was immediately necessary to protect or preserve Jennifer's life or to avoid serious injury to her."). We hold that Carol's private search was justified by the emergency exception.

### (3) Maureen's consent for the police to search the house

After Carol's original private search and discovery, police entered the home and searched. They did not have a warrant, but the trial court found that "Maureen Smith, who resided in the McDonald residence, gave consent for police to enter and search the home on March 1, 2019. Maureen had actual and apparent authority to grant consent to police to enter and search the home, and at no time was her consent revoked."

11

Appellant first argues that Maureen's consent was involuntary because it was obtained after an illegal search had begun. But, as explained above, Carol's search was not illegal.

Appellant next argues that Maureen did not have the ability to consent to search the bathroom where the blood was found. A third party's consent allows for a warrantless search "if the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 178 (1990); *Brimage v. State*, 918 S.W.2d 466, 481 (Tex. Crim. App. 1994) (en banc); *Hubert v. State*, 312 S.W.3d 554, 561 (Tex. Crim. App. 2010).

Maureen did not have any ownership interests in the home. But authority to consent does not require property rights. As explained by our Court of Criminal Appeals, a person with the right to use and access the property can consent:

> [C]ommon authority is shown by mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Hubert*, 312 S.W.3d at 560–61. Of course, simply living in a house does not necessarily give one the authority to consent to search every area of the house. A person may have joint access and control of some areas of the house, but others not. *See Corea v. State*, 52 S.W.3d 311, 316 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (holding that an individual who lived in apartment lacked authority to consent to search of appellant's bedroom because appellant had not given him consent to enter or use the bedroom). The focus is on the right to use or access those areas.

Maureen lived in the McDonald residence. She had her own bedroom and keys. Appellant points to the fact that Maureen was not at the home at the time of Andreen's disappearance.

12

Although Maureen occasionally worked at night out of the home, those short-term absences do not change her residence there. Maureen was also responsible for cleaning the house. She testified that she was free to enter the master bedroom and the master bathroom, where the blood was found, but would only do so if Appellant or Andreen were not in those rooms at that time. Because she had joint use of all areas of the house, Appellant "assumed the risk" that Maureen could consent to search those areas. *Hubert*, 312 S.W. 3d at 560–61.

### (4) Deputies' entry into garage on March 2nd

On March 2nd, the day after the initial search, deputies from the Sheriff's Community Oriented Response and Education Unit were dispatched to the McDonald residence to perform a welfare check. Deputies Richard Lozano and Ryan Gabriel testified that because of the broken garage door, they believed that someone could be hurt in the vehicle or garage. The trial court found their testimony to be "truthful and credible." They entered the garage and looked in the windows of the vehicle and saw a shovel in the back seat. This fact was used to obtain more search warrants. Appellant argues that evidence obtained through those warrants should have been excluded because the emergency exception did not apply to deputies' warrantless entry.[3]

As explained above, the emergency exception allows warrantless entry when the officer reasonably believes, based on facts he knows then, that entry is necessary to "protect or preserve life or avoid serious injury." *Shepherd*, 273 S.W.3d at 684 (quoting *Mincy v. Arizona*, 437 U.S. 385, 392 (1978)). All the deputies knew was that they were asked to do a welfare check on a missing person and that the garage door was torn off the tracks which is a "red flag" for them. Appellant argues that the trial court should have imputed the knowledge of *other* law enforcement

---

[3] Appellant also argues that the entry was not justified by the community caretaking exception. Although Lozano went to the house to do a welfare check, the State relied on the emergency exception to justify his warrantless entry.

13

officers and Appellant's Air Force Commander that Appellant accidentally damaged the garage door. With knowledge of an innocuous explanation for the damaged door, he reasons, the deputies could not have reasonably believed that an emergency made their warrantless entry necessary.

The State responds that Appellant did not preserve this issue because, on appeal, he complains about the actions of Deputy Lozano in particular, but his motion to suppress does not mention Lozano. Appellant's motion to suppress uses global language challenging the warrantless searches under the Constitution and Texas law as "presumptively unreasonable and absent any legal exception." And at the hearing on the motion to suppress, he argued that "the collective knowledge of law enforcement was well aware that the changed circumstance about the damaged door was not indicative of any ongoing criminal activity, was not indicative of some emergency within the home." Appellant's arguments were enough to notify the trial court of his specific objection. *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) (en banc) ("As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.").

The collective knowledge doctrine allows for "the sum of the information known to the cooperating agencies or officers at the time of an arrest or search by any of the officers involved. . . to be considered in determining whether there was sufficient probable cause therefor." *Woodward v. State*, 668 S.W.2d 337, 344 (Tex. Crim. App. 1982) (en banc) (op. on reh'g); *State v. Martinez*, 569 S.W.3d 621, 626 (Tex. Crim. App. 2019). The doctrine has been used to *uphold* a warrantless arrest or search when an individual officer lacks sufficient personal knowledge of grounds. Appellant has cited no authority, and we have found none, that supports using the doctrine

to *suppress* evidence or to negate the reasonable belief that emergency action is needed. But assuming without deciding that the collective knowledge doctrine can be used in this way, it would not require exclusion of the evidence here.

Use of the doctrine is appropriate "when there has been some cooperation between law enforcement agencies or between members of the same agency." *Woodward*, 668 S.W.2d at 344. The doctrine does not necessarily require communication between the officers, but the Court of Criminal Appeals expressly declined to extend the doctrine to "cases in which officers are not even in the same place at the same time and have relatively little communication." *Martinez*, 569 S.W.3d at 627. Deputies Lozano and Gabriel testified that they did not know that Appellant was being surveilled or that his commander had contact with him and knew about the door.[4] Because of the lack of communication and cooperation, the knowledge of other officers and Appellant's commander cannot be imputed to deputies Lozano and Gabriel.

The trial court did not err in denying Appellant's motion to suppress evidence obtained from or because of the March 2 warrantless entry.

### (5) *Franks* hearing

In his motion to suppress, Appellant also challenged evidence obtained through the search warrants, arguing that statements made in the search warrant affidavits were false or made with reckless disregard for the truth.

Generally, the sufficiency of a search warrant affidavit is determined by the contents of that affidavit. *Ramsey v. State*, 579 S.W.2d 920, 921 (Tex. Crim. App. [Panel Op.]1979); *Jones v.*

---

[4] In addition, there is no clear evidence that the officers surveilling Appellant were doing so when he ran into the garage door and knew that there was an innocent explanation. Appellant cites to a statement in an affidavit that states, "Investigator J. Borg observed the garage door to the suspect's residence torn off of the tracks." It is unclear if this refers to Borg seeing the act of tearing the door off the tracks or the state of the door being torn off the tracks.

*State*, 568 S.W. 2d 847 (Tex. Crim. 1978) (en banc). In *Franks v. Delaware*, however, the Supreme Court held that the Fourth Amendment requires that a defendant may challenge the truthfulness of the statements made to obtain a search warrant. *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978). A defendant is entitled to a hearing going behind the four corners of a search warrant affidavit when the defendant: (1) alleges a deliberate falsehood or reckless disregard for the truth; (2) accompanies those allegations with an offer of proof specifying the false statements and the reason for their falsity; and (3) shows that the affidavit without the false portions would be insufficient to show probable cause. *Id.*; *Ramsey*, 579 S.W.2d at 922. Appellant argues that he was entitled to a *Franks* hearing to go beyond the four corners of the search warrant. We review the denial of a *Franks* hearing as we do other suppression issues. We give "almost total deference" to the trial court's findings of fact and review questions of law de novo. *Gonzales v. State*, 481 S.W.3d 300, 309 (Tex. App.—San Antonio 2015, no pet.).

Although Appellant's motion to suppress alleged various false statements in the search warrant affidavit, his brief focuses solely on statements about the discovery of the shovel.[5] The affidavit states, "When [Deputy Gabriel] approached the residence he could see inside of the Porsche Macan and noticed a shovel that was not present during the previous search of the residence." While the affidavit could be clearer, it does not, as Appellant complains, claim that the deputies "observe[d] the shovel from outside of the McDonald's garage." Appellant's challenge,

---

[5] In his reply brief, Appellant points to another allegedly false statement–that Appellant "fled" when Carol, Elizabeth, and Maureen arrived at the house. Appellant cannot make this argument for the first time in his reply brief. Tex. R. App. P. 38.3 ("The appellant may file a reply brief addressing any matter in the appellee's brief."). In any event, the characterization of Appellant's quick departure as "fleeing" is not a deliberate falsehood. Even the Appellant himself testified that he left once they got to the house because "I was just trying to get out of the house, you know, you know, get away from these ladies and go clear my head . . . ." And, even if the statement that he fled was untruthful, it would have been Elizabeth's false statement, not the affiant's. *Salinas v. State*, 625 S.W.3d 203, 220 (Tex. App.—Corpus Christi–Edinburg 2021, pet. ref'd) ("[F]or a violation of *Franks*, the false statements must be made by the affiant himself, not by a third party."), citing *Franks v. Delaware*, 438 U.S. 154, 155-56, 164-65 (1978).

therefore, is not that the affidavit contains a false statement; but that it *omits* the facts about where the deputies were when they saw the shovel. Our sister court has held that *Franks v. Delaware* applies to material omissions as well as materially false statements. *Gonzales*, 481 S.W.3d at 311. But "[a]pplying the *Franks* analysis to material omissions requires varying the analysis somewhat." *Id.* Rather than determining whether the affidavit still states probable cause after excising a false statement, the court must determine whether the affidavit still states probable cause after including the omitted material.

If the affidavit in this case had clearly stated that the deputies saw the shovel only after they entered the garage, it would still state probable cause because they were allowed to enter the property under the emergency exception as explained above. Since the omissions were not material to probable cause, Appellant was not entitled to a *Franks* hearing. *Gonzales*, 481 S.W. at 312 (fact that the affiant relied on another officer regarding a witness' statement was not a material omission because he was allowed to do so to establish probable cause).

### (6) Search warrant for Appellant's phone

Appellant's cell phone was seized when he was arrested for murder. A search warrant was obtained, and the phone was searched which revealed hundreds of incriminating internet searches (for example about whether the climate or fire affects DNA, whether the cause of death can be determined from skeletal remains, and how long it takes an unburied body to decompose). Appellant argues that the affidavit used to obtain the search warrant did not show probable cause.

"Probable cause exists when, under the totality of the circumstances, there is a 'fair probability' that contraband or evidence of a crime will be found at the specified location." *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012), quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983). An officer applying for a search warrant for the contents of a phone must "state the

17

facts and circumstances that provide the applicant with probable cause to believe that: (A) criminal activity has been, is, or will be committed; and (B) searching the telephone or device is likely to produce evidence in the investigation of the criminal activity . . . ." Tex. Code Crim Proc. Ann. art 18.0215(b)(5). As a reviewing court, we give the magistrate's probable cause determination much deference. *State v. Baldwin*, 664 S.W.3d 122, 130 (Tex. Crim. App. 2022), cert. denied, 143 S. Ct. 777, (2023).

Cell phones are unique because of the amount and different types of evidence they contain–pictures, videos, messages, to name a few. *Riley v. California*, 573 U.S. 373, 386 (2014) ("Cell phones, however, place vast quantities of personal information literally in the hands of individuals."). But the fact that there is probable cause to believe someone committed a crime is not enough to show probable cause that their phone contains evidence of the crime. The Court of Criminal Appeals recently held that "generic, boilerplate language about cell phone use among criminals" is not sufficient to establish probable cause. *Baldwin*, 664 S.W.3d at 134. "[T]he [boilerplate] language must be coupled with other facts and reasonable inferences that establish a nexus between the device and the offense." *Baldwin*, 664 S.W.3d at 123. The nexus factor requires only that it is likely that the phone contains evidence of the crime; it does not require that the phone was used "either during, or immediately before or after" the crime was committed. *Stocker v. State*, No. PD-0711-22, 2024 WL 3588321, at *2 (Tex. Crim. App. July 31, 2024).

The search warrant affidavit for Appellant's phone recites boilerplate language about the how criminals can use cell phones; for example, "in order to communicate with other individuals regarding the events leading up to, during the commission of, and any subsequent activity after the crime;" or "to research developments in the case through the media, information regarding the victim or crime, and other relevant information about the case." But in addition to this generic

18

language, the affidavit also contains specific allegations about how Appellant used his phone to communicate about Andreen and the case. The affidavit states that Andreen's cousin, Sharon Hylton, told Andreen's brother-in-law that Appellant confessed to her that he accidentally killed Andreen.[6] Appellant and Hylton lived together after his first arrest and communicated often by cell phone. Hylton had two phones and consented to the extraction of one of them. That phone contained messages between Hylton and Appellant about removing Andreen's picture from a business website. When these texts were sent, Andreen was still considered missing by law enforcement. The affidavit contends that the messages were "more confirmation and corroboration of [Appellant]'s admission to Hylton that he accidentally killed Andreen [] as he would be aware she would not be returning to the business." The two also texted about the discovery of Andreen's body.

The information in the affidavit about Appellant and Hylton's known text communications about Andreen and her murder established "a nexus between the device and the offense" and was sufficient to show probable cause that the device would contain other communications and information about the crime. *Baldwin*, 664 S.W.3d at 123; *see also Antee v. State*, No. 14-20-00223-CR, 2022 WL 1679719, at *4 (Tex. App.—Houston [14th Dist.] May 26, 2022, pet. ref'd) (mem. op., not designated for publication) (finding an affidavit sufficient when it described how the phone was used to send messages about drug sales, threaten an officer, and identify the appellant).

Because we hold that the trial court did not err in denying Appellant's motion to suppress and request for a *Franks* hearing, we overrule Appellant's issue one.

---

[6] Hylton denied that Appellant told her this.

## B. Speedy trial

In Appellant's second issue, he claims his case should have been dismissed because the State violated his right to a speedy trial.

The Sixth Amendment to the U.S. Constitution, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, guarantees a defendant a right to a speedy trial.[7] *See* U.S. Const. amend. VI; *Klopfer v. State of North Carolina*, 386 U.S. 213, 222–26 (1967); *State v. Lopez*, 631 S.W.3d 107, 113 (Tex. Crim. App. 2021); *Balderas v. State*, 517 S.W.3d 756, 767 (Tex. Crim. App. 2016). When a defendant claims that the right to a speedy trial has been violated, courts analyze and weigh four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Lopez*, 631 S.W.3d at 113; *Balderas*, 517 S.W.3d at 767.

Courts must weigh the strength of each of the *Barker* factors and then balance their relative weights considering the State's and the defendant's conduct. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). The evidentiary burden differs depending on the *Barker* factor at stake. The State carries the burden to justify the length of the delay. *Cantu*, 253 S.W.3d at 280. The defendant carries the burden to show the delay is "presumptively prejudicial" and to prove he or she asserted his right and suffered prejudice. *Lopez*, 631 S.W.3d at 113–14; *Cantu*, 253 S.W.3d at 280. In reviewing the trial court's analysis of the *Barker* factors, we apply a bifurcated standard of review. *Lopez*, 631 S.W.3d at 113–14; *Balderas*, 517 S.W.3d at 767–68. Factual components are reviewed under an abuse of discretion standard, but we review legal components de novo. *Lopez*, 631 S.W.3d at 113–14. Consequently, we defer to explicit or implicit findings if they are

---

[7] A defendant also holds the right to a speedy trial under Article 1.05 of the Texas Code of Criminal Procedure. Tex. Code Crim. Proc. Ann. art. 1.05; *Hull v. State*, 699 S.W.2d 220, 221 (Tex. Crim. App. 1985) (en banc). On appeal, Appellant does not raise a separate issue under state law.

20

supported by the record and sustain the trial court's ruling. *Id.* at 114; *Balderas*, 517 S.W.3d at 767–68. Engaging in the *Barker* speedy-trial analysis on appeal requires us to assess each factor individually yet balance them holistically. *Lopez*, 631 S.W.3d at 114; *Balderas*, 517 S.W.3d at 768.

### (1) Length of delay

The length of the delay is significant because the longer a defendant must wait for trial, the more prejudicial the delay can be. *Zamorano v. State*, 84 S.W.3d 643, 648–49 (Tex. Crim. App. 2002) (en banc). "Generally, a delay of eight months to a year, or longer, is presumptively prejudicial and triggers a speedy trial analysis." *Lopez*, 631 S.W.3d at 114.

Appellant was arrested for tampering with the evidence on March 3, 2019, and for murder on July 13, 2019. Trial began on January 17, 2023. The parties agree that the delay of over 3 1/2 years was presumptively prejudicial.

### (2) Reason for the delay

In balancing the factors, the court assigns different weights to the reasons for the delay:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531.

Some of the delay in this case is attributable to the State, some to Appellant, some to the court system, and some is unexplained. These are the distinct periods that we can identify. The period between Appellant's arrest for tampering with evidence until he was charged with murder can be attributed to him as the State was searching for the body during that first four-month period.

21

The State is then accorded a reasonable period to prepare for trial. *See State v. Vasquez*, No. 08-16-00089-CR, 2018 WL 4178462, at *6 (Tex. App.—El Paso Aug. 31, 2018, no pet.) (mem op., not designated for publication) (six-month delay acceptable); *Rivero v. State*, 08-02-00191-CR, 2004 WL 42625, at *4 (Tex. App.—El Paso Jan. 8, 2004, no pet.) (not designated for publication) (agreeing that State is entitled to some time, but finding ten months was too long and would count against the State, but not heavily).

These combined periods of delay would have negated any trial until early 2020, but that is when the COVID-19 pandemic dominated the world's attention. On March 13, 2020, eight months after Appellant was arrested for murder, Texas Governor Greg Abbott issued a proclamation under the Texas Disaster Act of 1975 certifying that "COVID-19 poses an imminent threat of disaster" in all 254 Texas counties; he renewed that declaration in successive months. The Governor of the State of Tex., Proclamation No. 41-3720, 45 Tex. Reg. 2087, 2095 (2020). The same day, the Texas Supreme Court issued its first order that "subject only to constitutional limitations," all courts were required to modify their procedures to avoid the risk to court staff, parties, attorneys, jurors, and the public. *First Emergency Ord. Regarding COVID-19 State of Disaster*, 596 S.W.3d 265 (Tex. 2020).

The delay caused by the suspension of, and then later limitations on jury trials because of COVID-19 cannot be assigned to either Appellant or the State. *See Montez v. State*, No. 08-23-00026-CR, 2024 WL 378861, at *6 (Tex. App.—El Paso Jan. 31, 2024, no pet. h.) (mem. op, not designated for publication) (so holding in transfer case from Bexar County); *State v. Elizondo*, No. 04-21-00489-CR, 2022 WL 3047103, at *3 (Tex. App.—San Antonio Aug. 3, 2022) (mem. op., not designated for publication) ("However, courts that have considered the impact of the pandemic on speedy-trial rights have nearly all countenanced additional delays resulting from the

pandemic."); *United States v. Dunn*, 83 F.4th 1305, 1316 (11th Cir. 2023) ("The government points out that our sister circuits have held that the national public health emergency caused by the global COVID-19 pandemic provided sufficient justification for a district court's district-wide blanket order temporarily continuing jury trials during this pandemic and excluding that time under the Speedy Trial Act's ends-of-justice exception.") (collecting cases). Although some delays, like overcrowded courts, can still count "less heavily" against the State, we are reluctant to put the early phase of the COVID-19 pandemic in that same category.

This case was first set for trial on August 30, 2021, which we might presume was at a time when the trial court believed it could safely proceed with in-person trial proceedings. Appellant, however, requested a continuance of that setting based on the unavailability of an expert witness, which weighs against him, but not heavily. The trial court next heard the State's motion for continuance on November 3, 2021 which was based on delays in getting additional discovery held by the Bexar County Sheriff's Office to Appellant.[8] The lead detective for that office had retired and the new detective discovered additional materials that had not been disclosed. Additionally, several of Appellant's work computers that the Air Force said had been wiped clean of data, in fact had not been; the State was retrieving and sharing that data. The trial court granted that motion, but at the same time reduced Appellant's bond and he bonded out. The trial court offered an early December trial date, but based on the additional discovery that the State would be producing, Appellant offered that a trial date at first of 2022 would be a best-case scenario.

The next event is the trial in January 2023. Any delay during 2022 is unexplained or at most resulted from the backlog of cases and the court's compliance with local rules requiring that incarcerated inmates have priority (Appellant had bonded out of jail by that time). Bexar Co. Loc.

---

[8] The case had been set been set on the docket for October 22, 2021 and presumably not reached.

23

R. 13.3 (providing that "a jail case with over 90 days in custody takes precedent over a bond case" and "[t]he case with the longest number of days in jail takes precedent"). This delay weighs against the State, but only slightly. *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003) ("In the absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the part of the State to prejudice the defense nor a valid reason for the delay.").

### (3) Appellant's assertion of the right

Appellant was responsible for asserting his right to a speedy trial. *Cantu*, 253 S.W.3d at 282. At the status hearing in August 2019, around one month after Appellant was arrested for murder, he demanded a speedy trial. Yet he also was demanding discovery, was not yet ready for trial, and did not request a trial date. In December 2020 and October 2021, Appellant filed pretrial applications for writs of habeas corpus, in which he recited that he requested a speedy trial but, again, he did not ask for a trial setting. In both these filings he sought a bond reduction and referenced the speedy trial request as one of several reasons for reducing the bond. At a bond reduction hearing in March 2021, Appellant did not request a trial setting or urge his motion for speedy trial. On July 28, 2021, he filed his first written motion to dismiss the case for a speedy trial violation or, in the alternative, to hold the trial no later than the date it was already scheduled. Appellant did not set that motion for hearing until the pretrial hearing on the day voir dire was to start. *Dragoo*, 96 S.W.3d at 314 (noting that the failure to assert the right until trial is imminent strongly indicates that the defendant does not really want a speedy trial and that he was not prejudiced by the lack of one).

Although Appellant mentioned his right to a speedy trial in several filings and filed a motion requesting a speedy trial, there is no evidence that he requested a hearing on his request until the day trial began. His failure to do so weighs against him. *Cook v. State*, 741 S.W.2d 928,

940 (Tex. Crim. App. 1987) (en banc), *vacated and remanded on other grounds*, 488 U.S. 807 (1988) ("there is no evidence beyond the two motions for speedy trial filed with the district clerk that appellant asserted his right to a speedy trial by requesting hearings to present evidence on the matter."); *see also State v. Page*, No. 05-18-01391-CR, 2020 WL 1899453, at *8 (Tex. App.—Dallas Apr. 17, 2020, no pet.) (mem. op., not designated for publication) (same); *Ussery v. State*, 596 S.W.3d 277, 288 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) ("Moreover, a motion for speedy trial must be presented to the trial court to preserve a complaint for appellate review, and presentment means more than mere filing.") (internal quotes omitted).

### (4) Prejudice to the Defendant

An accused's right to a speedy trial is meant to protect three interests: "1) to prevent oppressive pretrial incarceration; 2) to minimize anxiety and concern of the accused; and 3) to limit the possibility that the defense will be impaired." *Zamorano*, 84 S.W.3d at 652, citing *Barker*, 407 U.S. at 532. Whether a defendant is prejudiced by a delay is analyzed by how the delay affects these interests.

At trial, as he does on appeal, Appellant argued that had trial happened earlier, the State "may have had a smaller amount of evidence that would prejudice [Appellant] at trial and be . . . negative for [Appellant] at trial." Prejudice that impairs a defendant's defense "is the most important because the fairness of the criminal-justice system is distorted when a defendant is unable to adequately prepare his defense." *Balderas*, 517 S.W.3d at 772. But this typically refers to times when the defendant *loses* access to material evidence because of the delay–for example, because a witness dies or disappears. *Russell v. State*, 90 S.W.3d 865, 873–74 (Tex. App.—San Antonio 2002, pet. ref'd). Appellant has cited no authority that a speedy trial is meant to avoid the State's ability to *obtain* more evidence of a defendant's guilt. Appellant also points to his

incarceration pending trial, to his inability to see his daughter because of bond conditions, and unspecified damage to his career. We agree that these results of delay are prejudicial.

### (5) Balancing the factors

Our balance of the four *Barker* factors is de novo. *Balderas*, 517 S.W.3d at 768. That de novo review is guided by these cautionary comments from the Texas Court of Criminal Appeals:

> Because dismissal of the charges is a radical remedy, a wooden application of the *Barker* factors would infringe upon "the societal interest in trying people accused of crime, rather than granting them immunization because of legal error." Thus, courts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. The constitutional right is that of a speedy trial, not dismissal of the charges.

*Cantu*, 253 S.W.3d at 281 (quoting *United States v. Ewell*, 383 U.S. 116, 121 (1966) (footnotes omitted)).

The length of delay weighs in Appellant's favor. We also acknowledge that he has shown some prejudice from this delay for its impact on him, but not for the conduct of his defense. The factor that weighs most heavily against Appellant was the failure to assert his right to a speedy trial. It was first asserted when he was not ready for trial. It was then asserted as an adjunct to obtaining a bond reduction. Once out on bond, he filed an actual motion asserting his right to a speedy trial, but did not set it for hearing, and only then on the eve of trial. And finally, while we can ascribe some delay to the State, and some to the judicial system, most of the delay stemmed from factors outside anyone's control or Appellant's (or his counsel's) conduct. A holistic balance of the four factors does not support Appellants' claim.

Accordingly, we overrule Appellant's second issue.

26

### C. Failure to provide notice of the intent to seek a deadly weapon finding.

Appellant's fourth issue complains that he received insufficient notice that the State sought a deadly weapon finding. After the jury entered a guilty verdict, the State filed a notice of intent to seek a deadly weapon finding. The court, sitting as trier of fact at the punishment phase, made a deadly weapon finding.[9] Appellant argues that the notice he received was untimely.

A finding that a deadly weapon was used in a crime has significant consequences. It can affect a defendant's right to community supervision and how much time he or she must serve before the possibility of parole. *Duran v. State*, 492 S.W.3d 741, 745–46 (Tex. Crim. App. 2016). Because these consequences may inform their trial strategy, defendants are entitled to notice that the State will seek a deadly weapon finding. *Ex parte Beck*, 769 S.W.2d 525, 526 (Tex. Crim. App. 1989) (en banc).

Notice can be given in the indictment or other writing. *Ex parte Patterson*, 740 S.W.2d 766, 776 (Tex. Crim. App. 1987) (en banc); *Brooks v. State*, 847 S.W.2d 247, 248 (Tex. Crim. App. 1993) (en banc). The notice requirement is also fulfilled if the indictment alleges a crime that, by its nature requires a deadly weapon. *Beck*, 769 S.W.2d at 526–27. A deadly weapon is:

(A)     a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or

(B)     anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

Tex. Pen. Code Ann. § 1.07 (17). "[A]ny allegation which avers a death *was caused* by a named weapon or instrument *necessarily includes* an allegation that the named weapon or instrument was,

---

[9] This finding was made orally but is not included in the judgment. But because the order is subject to correction through a nunc pro tunc, we address this issue. *Ex parte Poe*, 751 S.W.2d 873, 876 (Tex. Crim. App. 1988) (en banc) (holding that court could correct enter judgment nunc pro tunc to enter a deadly weapon finding made by the trier of fact).

'in the manner of its use . . . capable of causing" (since it *did* cause) death.'" *Beck*, 769 S.W.2d at 526; *see also Blount v. State*, 257 S.W.3d 712, 714 (Tex. Crim. App. 2008) (holding that an indictment for aggravated assault gave notice of an intent to seek a deadly weapon finding because the crime is committed either by causing serious bodily injury, in which case the defendant used something capable of such an injury, or by using or exhibiting a deadly weapon); *Vickers v. State*, 467 S.W.3d 90, 96 (Tex. App.—Texarkana 2015, pet. ref'd) (holding that defendant had notice of intent to seek deadly weapon finding because an aggravated assault "cannot be committed without either using a deadly weapon or causing serious bodily injury"); *Bautista v. State*, 363 S.W.3d 259, 267–68 (Tex. App.—San Antonio 2012, no pet.) ("'causing serious bodily injury' necessarily implies the use of a deadly weapon."). This is true even when the indictment alleges that the instrument causing the death or injury is not a traditional weapon or when it alleges an unknown manner and means. *Johnson v. State*, 815 S.W.2d 707, 709 (Tex. Crim. App. 1991) (en banc) (holding that indictment that alleged defendant caused death with his hands and feet was sufficient); *Mixon v. State*, 804 S.W.2d 107 (Tex. Crim. App. 1991) (en banc) (per curiam) (affirming finding that an unknown object was a deadly weapon).

The indictment in this case alleged that Appellant caused Andreen's death "by a manner and means unknown to the Grand Jury." Regardless of the means of her death, whether by a traditional weapon or not, it was obviously "capable of causing death" and was therefore a deadly weapon. Therefore, the indictment, by alleging a murder, gave notice that the State intended to seek a deadly weapon finding.

Because Appellant had notice of the State's intent, we overrule his fourth issue.

28

**D. Legal sufficiency of evidence for jury to reject self-defense claim**

In Issue Five, Appellant contends that the evidence is legally insufficient to negate his claim of self-defense. The jury was instructed to find Appellant not guilty of murder or manslaughter if it found or had a reasonable doubt that he was acting in self-defense. By finding Appellant guilty, the jury implicitly rejected his claim of self-defense. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (en banc). Appellant argues that the evidence was legally insufficient for the jury to do so. In a sufficiency challenge, "we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914.

Appellant argues that the evidence was insufficient because the State presented no evidence contrary to his testimony that he kicked Andreen in self-defense.[10] First, the State had no burden to produce evidence contradicting Appellant's defense. A defendant has the burden of producing evidence to raise the issue of self-defense. Once raised, the State has the burden of persuasion to disprove it. *Saxton*, 804 S.W.2d at 912–13; *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *Benevento v. State*, No. 04-21-00483-CR, 2023 WL 2147722, at *4 (Tex. App.—San Antonio Feb. 22, 2023, no pet.) (mem. op.). The State is not required to produce additional evidence. Instead, it has the burden of convincing the jury beyond a reasonable doubt not just that the defendant committed the crime, but also that he was not justified by self-defense. *Saxton*, 804 S.W.2d at 914.

---

[10] Insofar as the State introduced evidence that Appellant hit Andreen with a hammer, Appellant argues that evidence does not contradict self-defense because he testified that he hit her with the hammer after she died, which was consistent with the State's evidence that when law enforcement first saw the hammer, it did not have blood on it.

Second, even though Appellant's evidence (his testimony) fits the State's evidence, a rational jury considering that evidence could reject his self-defense claim. "Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914. "Although the parties may disagree about the logical inferences that flow from undisputed facts, where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (internal quotations omitted). Based on the evidence, the jury could have rationally disbelieved that all Appellant did was kick her. Or they could have believed that Appellant only kicked Andreen, but rejected the claim that he reasonably believed that Andreen (while laying on the floor) was "using or attempting to use unlawful deadly force" or that using deadly force was "immediately necessary to protect himself" as required to find self-defense. Tex. Penal Code Ann. §§ 9.31, 9.32. Because a rational jury could have concluded that Appellant did not act in self-defense, its verdict was supported by legally sufficient evidence.

We overrule Appellant's fifth issue.

### E. Jury instructions

Appellant argues that the trial court's jury charge was erroneous in three ways: (1) it failed to instruct the jury on the collective knowledge doctrine (Issue Three); (2) it failed to instruct the jury on Appellant's right to use non-deadly force (Issue Six); and (3) if failed to include a charge on negligent homicide (Issue Seven).

As for the latter two of these claimed charge errors, Appellant did not object to the omissions or submit his own requested instructions. The parties dispute whether such an objection

was necessary. Appellant contends that his failure to object affects only the harm analysis. Under *Almanza*, objected-to jury charge error is reversible if it causes some harm while unobjected-to error is reversible if it causes egregious harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (en banc). Even so, the *Almanza* harm framework does not apply unless there is error, so we begin there. *Posey v. State*, 966 S.W.2d 57, 60 (Tex. Crim. App. 1998) (en banc) ("Neither "harm" standard set out in Article 36.19 as construed by *Almanza* applies unless an appellate court first finds "error" in the jury charge.").

### (1) Jury instruction–collective knowledge of law enforcement

The jury charge instructed the jury that it should disregard all evidence obtained by the deputies' March 2nd warrantless unless it found that the emergency aid exception applied. Like his suppression argument, Appellant argues that the jury should have been instructed to consider what law enforcement *collectively* knew when determining whether the deputies had a reasonable belief that entry was necessary to "protect or preserve life or avoid serious injury"; specifically that Appellant accidentally damaged the garage door. *Brigham City*, 547 U.S. at 403.

A defendant must meet three requirements to be entitled to an instruction to disregard evidence under Article 38.23 of the Code of Criminal Procedure:

(1) The evidence heard by the jury must raise an issue of fact;

(2) The evidence on that fact must be affirmatively contested; and

(3) That contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence.

*Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007).

As explained above, for the collective knowledge doctrine to apply, the deputies conducting the March 2nd welfare check must have been coordinating in some way with other officers who knew Appellant damaged the garage door. Because there was no evidence that the

deputies who conducted the welfare check were coordinating with other law enforcement that was surveilling Appellant and knew about the garage door, the evidence did not raise a fact issue about the collective knowledge doctrine, the trial court properly denied Appellant's request to include an instruction. We overrule Issue Three.

### (2)  Self-defense instruction–non-deadly force

The charge included an instruction under § 9.32 of the Texas Penal Code requiring the jury to acquit if it found that or had a reasonable doubt about whether Appellant was justified in using deadly force. Appellant now argues that the trial court should have also included instructions under § 9.31 of the Texas Penal Code that the jury acquit if they found that Appellant was justified in using *non-deadly* force. "'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." Tex. Pen. Code Ann. § 9.01(3). The force used by Appellant was deadly force because it capable of causing death. He was therefore not entitled to a jury instruction on self-defense by non-deadly force. *Ferrel v. State*, 55 S.W.3d 586, 591–92 (Tex. Crim. App. 2001) (holding that the court did not err in refusing to give an instruction under § 9.31 when the force used caused serious bodily injury and was therefore, by definition, deadly force); *Wood v. State*, 271 S.W.3d 329, 337 (Tex. App.—San Antonio 2008, pet. ref'd) (holding that because the victim died from the force, the appellant used deadly force and was not entitled to a non-deadly force instruction).[11] We overrule Issue Six.

---

[11] Appellant argues that *Alonzo v. State* requires an instruction on non-deadly force. The Court there stated, "The self-defense provisions in the Penal Code focus on the actor's motives and on the level of force used, not on the outcome of that use of force." *Alonzo v. State*, 353 S.W.3d 778, 783 (Tex. Crim. App. 2011). The Court, however, was discussing whether self-defense applied to offenses with a *mens rea* of recklessness and not whether a defendant who uses deadly force is entitled to an instruction on the use of non-deadly force. *Id.* at 782–83. The Court in *Alonzo* in fact recognized that force that results in death is deadly force and that a jury in that situation would be asked if the use of deadly force was necessary. *Id* at 783, n.22.

**(3)   Lesser-included offense–negligent homicide**

Appellant argues under his last issue that the record supports a finding he committed negligent homicide, and that he was entitled to a jury instruction on that lesser included offense. Defensive issues, however, are a matter of trial strategy and courts do not have a duty to *sua sponte* instruct the jury on them. *Tolbert v. State*, 306 S.W.3d 776, 781 (Tex. Crim. App. 2010); *Thomas v. State*, 701 S.W.2d 653, 656 (Tex. Crim. App. 1985) (en banc) (stating that because appellant did not request a jury charge instruction on the lesser-included offense of negligent homicide, it would not consider his argument on appeal that the trial court erred in failing to give the instruction). Because there is no duty for the trial court to issue defensive instructions without a request, the court does not err in failing to do so. Appellant's seventh issue is overruled.

## III.   CONCLUSION

We overrule each of Appellant's issues and affirm the trial court's conviction.


JEFF ALLEY, Chief Justice


August 9, 2024

Before Alley, C.J., Palafox, and Soto, JJ.

(Do Not Publish)